UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| MATTHEW G. KODREA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:04-cv-1843-LJM-WTL |
| | ) | |
| CITY OF KOKOMO, INDIANA, and | ) | |
| MATTHEW McKILLIP, *individually and as* | ) | |
| *Mayor of the City of Kokomo*, | ) | |
| DAN SMITH, *in his individual capacity*, and | ) | |
| JACK DODD, *in his individual capacity*, | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants', City of Kokomo, Indiana (the "City"), Matthew McKillip (the "Mayor"), Dan Smith ("Smith"), and Jack Dodd ("Dodd") (all four defendants collectively, "Defendants"), Motion for Summary Judgment.  In his Amended Complaint, Plaintiff, Matthew G. Kodrea ("Kodrea") raises claims under 42 U.S.C. § 1983 and Indiana Code § 36-1-8-8, a state "whistleblower" statute.  More specifically, Kodrea contends that Defendants unlawfully terminated him in retaliation for his reports of two situations of alleged abuse within City government.  As a result, Kodrea claims that Defendants violated his rights guaranteed by the First Amendment and the state statute.  The parties have fully briefed the matter and it is now ripe for ruling.

For the reasons stated herein, Defendants' motion is **GRANTED in part and DENIED in part**.

## I. PRELIMINARY EVIDENTIARY CONSIDERATIONS

Defendants requested in their reply brief that the Court strike several items that Kodrea submitted with his designated materials in opposition to the motion for summary judgment. Defendants also filed a Motion to Strike Affidavits that were submitted with Kodrea's sur-reply. The list of items that Defendants seek to strike are as follows: (1) letters from Alan Warner ("Warner") and Joe Hawkins ("Hawkins"), as well as their affidavits submitted with the sur-reply; (2) affidavits of Patsy Liali ("Liali") and David McKinney ("McKinney"); (3) the affidavit of James Trobaugh ("Trobaugh"), former Mayor of Kokomo; (4) Findings of Fact, Conclusions of Law, and Order entered by the Howard Circuit Court in the case styled *Kern v. City of Kokomo*, Cause No. 34C01-0507-PL-0632 ("*Kern* Order"); and (5) deposition exhibits labeled 12(B), 12(C), and 12(F)[1] and the affidavit of Jesse A. Dixon ("Dixon").   The Court addresses each of these five groups of items in turn.

First, with respect to the Warner and Hawkins letters, Defendants argue that the letters contain inadmissible hearsay and that they not self-authenticating and contain no foundation for their consideration.  Defendants also seek to strike the affidavits, which are duplicative of the information in the letters.  As an initial matter, the Court notes that evidence offered during a summary judgment proceeding need only be admissible in content, not in form.  *See Juarez v. Menard, Inc.*, 366 F.3d 479, 484 n.4 (7th Cir. 2004).  Kodrea identified the letters as ones he had received from Warner and

---

[1]  Apparently the exhibits were numbered at the various depositions that have been taken in this case on an ongoing basis rather than separately numbered for the particular deposition in which they were identified.  Rather than re-label these exhibits when he filed his designated materials, Kodrea simply used the original designated numbers.  For clarity, the Court will refer to those exhibits as they were designated at the depositions and cite to them as "Dep. Ex. __" in this Order.

Hawkins and attached them to his own affidavit.   Kodrea Aff., ¶ 13.   Warner and Hawkins'
affidavits simply restate the same information contained in the letters and were offered in response
to Defendants' authentication and foundation concerns, *i.e.*, the form of the letters.   To the extent
the letters and affidavits contain hearsay, the Court will disregard such information; however, the
Court declines to strike these materials in their entirety at this stage of the proceedings on merely
technical grounds.

Next, the Court considers the affidavits of Liali and McKinney.   Defendants first contend
that the affidavits should be struck because they improperly contradict Kodrea's testimony.
Defendants do not explain the basis for this objection, and they fail to make any citation to that
portion or portions of Kodrea's testimony that they believe is contradictory.   The Court declines to
scour the record and make Defendants' argument for them.   Defendants next raise a hearsay
objection to paragraphs 4 through 7 of Liali's affidavit and paragraphs 6 through 8 of McKinney's
affidavit.   Portions of those paragraphs relate to things that Kodrea indicated were said or done by
Smith.   To the extent that these statements are offered to prove what Smith may have said, they are
hearsay and will be disregarded.   However, the Court declines to strike the affidavits in their
entirety.

Third, Defendants seek to strike Trobaugh's affidavit on the basis that it is irrelevant under
Federal Rule of Evidence ("FRE") 402.   "Relevant evidence" is that evidence which has a tendency
to make the existence of any fact of consequence to the determination of the action more or less
probable.   FRE 401.   Kodrea argues in his surreply that the affidavit is relevant to demonstrate that
Defendants should reasonably have known that employees could not be retaliated against for
exercising their First Amendment right to speak out on matters of public concern.   Thus, the

3

affidavit is relevant to the issue of qualified immunity.  The Court concludes that Trobaugh's affidavit has some relevance to that issue and therefore denies Defendants' request to strike Trobaugh's affidavit.

Fourth, Defendants seek to strike the *Kern* Order on the basis that it is irrelevant.  Kodrea claims that the *Kern* Order is relevant to showing a municipal pattern and practice of violating First Amendment rights of City employees.  The Court does have some concerns about the relevancy of the *Kern* Order.  Though the parties do not discuss it in detail, Kern ( unlike Kodrea) presumably was a merit-based employee and decisions regarding his employment fell under a merit-based system.  Further, it appears that Kern vocalized his particular concerns directly to the public via the media.  Based on these distinctions, the probative value of the *Kern* Order is slight, and when considering the potential prejudice under FRE 403 the *Kern* Order might well be excluded.  The Court is hesitant, however, to strike the *Kern* Order prematurely at this stage of the proceedings.  In any event, the Court concludes that the *Kern* Order is not necessary for disposition of Defendants' Motion for Summary Judgment and need not even be considered.

Finally, Defendants seek to strike deposition exhibits 12(B), 12(C), and 12(F) and the Dixon affidavit.  Kodrea identified the deposition exhibits in his own affidavit and attached the Dixon affidavit to his surreply.  Kodrea Aff., ¶ 6; Surreply.  The deposition exhibits contain various e-mails, letters, cards, a list of achievements and community activities, and newspaper articles about Kodrea's community involvement and work on behalf of the Parks Department.  Deposition exhibit 12(F) in particular appears to be a letter that Dixon wrote and the information contained therein is duplicative of that in the Dixon affidavit.  Defendants's arguments regarding the deposition exhibits are broad and do not specifically discuss each particular document of the numerous documents

4

submitted, but they seek to strike the deposition exhibits on the basis of inadmissible hearsay and improper character evidence under FRE 404.  Defendants' Motion to Strike seeks to exclude the Dixon affidavit pursuant to Local Rule 56.1(d).

     With respect to the deposition exhibits, the Court finds that the newspaper articles, to the extent that they are being offered for the truth of the matters asserted therein, are inadmissible hearsay and cannot be relied upon for summary judgment proceedings.  *See Chi. Firefighters Local 2 v. City of Chicago,* 249 F.3d 649, 654 (7th Cir. 2001); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).  To the extent that the newspaper articles discuss Kodrea's community involvement, they are also irrelevant and will be struck.  Likewise, the items that relate to Kodrea's character and go beyond his capacity for truthfulness are improper character evidence under FRE 404 and are inadmissible.  The Court will further disregard as irrelevant the unsigned note about child labor laws, Kodrea's list of community activities that are unrelated to his job, and various recommendation letters from the fire chief, Delphi supervisor, Howard County Sheriff, and a City councilman, all which appear to pre-date the beginning of Kodrea's employment with the Parks Department.  However, any remaining items that relate to Kodrea's work performance or suggest the level of involvement by each individual defendant in the employment actions against Kodrea will be considered for the limited purposes of refuting Defendants' evidence to the contrary.  Finally, with respect to deposition exhibit 12(F) and the Dixon affidavit, the Court declines to strike those matters for the same reasons discussed above for the Warner and Hawkins items.

## II.  BACKGROUND

Kodrea was hired as the recreational programmer for the City's Parks Department on July 28, 2003.  Kodrea Dep. at 47.  Although he had some sports-related experience from participation in athletics during high school and college, Kodrea did not have any particular work experience as a recreational programmer.  Kodrea Dep. at 10, 28-29.  Kodrea's immediate supervisor was Smith, Superintendent of the Parks Department.  Kodrea Dep. at 47.  Smith was supervised by the Mayor. Kodrea Dep. at 47.  Dodd was Director of Human Resources.  Dodd Dep. at 12-13.

As a new employee, Kodrea was supposed to receive a 30-day, a 60-day, and a 90-day evaluation.  Smith Dep. at 67.  Kodrea claims that he did not actually receive a 30-day evaluation, but he contends that Smith verbally informed him that he was doing fine.  Kodrea Dep. at 108. Kodrea's subsequent 60-day and 90-day evaluations were favorable for the most part, as was his "end of the year" evaluation in January 2004.  Kodrea Dep. at 107; Dep. Ex. 12(D).

Kodrea's job responsibilities included supervising and coordinating recreational programs and supervising the seasonal staff for concession stands.  Kodrea Dep. at 29, 71-72.  Kodrea was also encouraged to work as the district commissioner for the American Softball Association ("ASA").  Kodrea Dep. at 84-86.  However, nothing in Kodrea's job description required him to monitor or report misconduct.  Dep. Ex. 13; Kodrea Dep. at 29.  In addition, Kodrea was not responsible for signing and approving or otherwise completing employee time sheets.  Metz Dep. at 16-18; Reed Dep. at 32, 35, 41; Kodrea Dep. at 144; Kodrea Aff., ¶ 5.  Further, with respect to the ASA, Kodrea was not responsible for determining the amount of the ASA fees.  Reed Dep. at 17; Kodrea Dep. at 87.  Beyond keeping track of the teams and collecting the registration fees for teams, Kodrea was not responsible for handling ASA money.  Kodrea Dep. at 88-91; Metz Dep. at

12-13; Reed Dep. at 17, 25.

Sometime in the fall of 2003, Kodrea noticed a discrepancy with the time for one of the seasonal employees, Jim Campbell ("Campbell"). Kodrea Dep. at 77-78, 130-31. Kodrea also noted that Campbell had not completed the closing procedures for one of the concession stands. Kodrea Dep. at 130. Kodrea reported the problem to Smith. Kodrea Dep. at 135, 138. Smith told Kodrea to take care of the problem, so Kodrea ordered that Campbell's checks be stopped and finished closing the concession stands himself. Kodrea Dep. at 130, 135.

In May of 2004, Kodrea again noted a discrepancy with Campbell's time and claims that he once again notified Smith to voice his concerns that Campbell was being paid for hours that he had not worked. Kodrea Dep. at 140-42. Kodrea also told Smith that Campbell was working for another company and not working his actual hours. Kodrea Dep. at 142. Smith allegedly told Kodrea that Campbell kept Smith from being audited and that Campbell's time was not an issue and not to worry about it. Kodrea Dep. at 140, 142-43. More specifically, Kodrea claims that Smith stated, "That's never been a problem, it's not a problem now, and it's never going to be a problem." Kodrea Dep. at 143.

Shortly thereafter, in June of 2004, Kodrea was contacted by Wayne Meyer ("Meyer"), the State ASA Commissioner. Kodrea Dep. at 89-90. Meyer asked Kodrea where the "refund check" for overpayment of ASA fees for that year should be sent because the prior recreational programmer was no longer employed at the City. Kodrea Dep. at 90. When Kodrea questioned Smith about the ASA refund, Smith told Kodrea not to worry about it and that he would take care of it. Kodrea Dep. at 94. Kodrea claims that Smith was very abrupt and direct with his response. Kodrea Dep. at 96.

Kodrea claims that shortly after he brought the ASA refund issue to Smith's attention he received a problem employee performance appraisal. Kodrea Dep. at 96; Dep. Ex. 12(E). Kodrea claims that he had never received any indication of a problem with his work nor any counseling on performance issues prior to receiving the appraisal, a point disputed by Defendants. Kodrea Dep. at 70, 118; McKillip Dep. at 43, 54-55; Dodd Dep. at 43; Smith Dep. at 51, 63-64, 74-75, 78-79. Kodrea claims that Smith called him into Smith's office and informed him that no one had seen the appraisal yet and that Kodrea's next evaluation in thirty days was already prepared with the same information and that Kodrea would be terminated at that point. Kodrea Dep. at 120-21; Dep. Ex. 26. Kodrea also claims that Smith gave him an ultimatum to either resign by noon the following workday and no one would see the appraisal or Kodrea would be terminated with the appraisal on his record and Smith would make sure that he did not get another City job. Kodrea Dep. at 120; Dep. Ex. 26.

Rather than resign, Kodrea alleges that he reported the meeting to Dodd and expressed his belief that he was being retaliated against for reporting Campbell and the ASA refund issue. Kodrea Dep. at 146-49; Kodrea's Answers to Interrogatories at 3. Kodrea claims that Dodd stated he would investigate. Kodrea Dep. at 146-49; Kodrea's Answers to Interrogatories at 3. Kodrea also submitted a written response to the appraisal and alleged that he was being retaliated against for bringing Campbell's work hours and the ASA refund to Smith's attention. Kodrea Dep. at 100, 126; Dep. Ex. 12(E). Thereafter, Smith removed the concession staff from Kodrea's supervision and removed all ASA contacts from Kodrea's responsibility. Kodrea Dep. at 221; Kodrea's Answers to Interrogatories at 12.

A week after receiving the problem employee performance appraisal, Dodd informed Kodrea that he was being placed on probation for thirty days. Kodrea Dep. at 146; Dodd Dep. at 98. Kodrea was required to undergo counseling sessions with Smith, which were attended by Dodd. Kodrea Dep. at 147, 153; Dodd Dep. at 41, 53. Kodrea continued to raise concerns about what he considered Campbell's time abuse and the misuse of public funds and complained that he felt he was being retaliated against for reporting these instances. In fact, he submitted a written report to Dodd about the two instances of alleged misconduct. Kodrea Dep. at 172. Kodrea also sought a transfer to another department, but his request was denied. Kodrea Dep. at 206; Dodd Dep. at 88.

Kodrea claims that he completed the probationary period satisfactorily. Kodrea Dep. at 154, 156. In fact, both Smith and Kodrea signed a list entitled "Goals and Objectives" which indicated completion of the probationary period. Dep. Ex. 33. In contrast, the Defendants claim that the probation period was extended for an additional thirty days, though there is nothing in writing to indicate that this is the case. Dodd Dep. at 71; Smith Dep. at 65. Rather, Defendants claim that Kodrea was verbally advised of the extension of the probationary period. Dodd Dep. at 71, 90; Smith Dep. at 65, 87, 89, 148-49. On September 9, 2004, prior to the completion of this disputed second probationary period, Kodrea was terminated based on Smith's recommendation. Kodrea Dep. at 157; Dodd Dep. at 13; Smith Dep. at 49. Kodrea sought reinstatement via the City's grievance process, but he was unsuccessful. McKillip Dep. at 59.

### III. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just,

speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327

(1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68

(7th Cir. 1990), *cert. denied*, 499 U.S. 923 (1991). Motions for summary judgment are governed

by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits, if any,
> show that there is no genuine issue as to any material fact and that the moving party
> is entitled to a judgment as a matter of law.

Summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge

Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003), *reh'g denied*. Once a party has made a

properly-supported motion for summary judgment, the opposing party may not simply rest upon the

pleadings but must instead submit evidentiary materials that "set forth specific facts showing that

there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact exists

whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict

for that party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). The nonmoving party

bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita

Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp*.,

96 F.3d 992, 997 (7th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997). It is not the duty of the Court

to scour the record in search of evidence to defeat a motion for summary judgment; rather, the

nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See

Bombard v. Fort Wayne Newspapers, Inc*., 92 F.3d 560, 562 (7th Cir. 1996). When the moving party

has met the standard of Rule 56, summary judgment is mandatory. *Celotex*, 477 U.S. at 322-23;

*Shields Enters., Inc. v. First Chicago Corp*., 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, a court should draw all reasonable inferences

from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co*., 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co*., 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

## IV. DISCUSSION

### A. RETALIATION CLAIM UNDER § 1983

Kodrea claims that he was terminated in retaliation for questioning Campbell's work hours and questioning how the ASA refund was handled. His claim rests on an alleged violation of his First Amendment right to free speech.[2]

---

[2] The Court notes that Kodrea has sued the Mayor in both his official and individual capacities. An official capacity suit against government employees is treated in all respects as one suit against the municipality. *See Leahy v. Bd. of Tr's of Cmty. Coll. Dist. No. 508*, 912 F.2d 917, 922 (7th Cir. 1990). In addition, courts have emphasized that civil rights claims against individual defendants in their official capacities are redundant of the claims brought against a governmental entity; therefore, there exists no additional claims against the Mayor in his official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985); *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986). Kodrea concedes this point in his response to the motion for summary judgment. Resp. in Opp. to Summ. J. at 39. Accordingly, the Court **DISMISSES** the

Generally speaking, public employment cannot be conditioned on a basis that infringes on an employee's constitutionally protected interest in freedom of expression. *See Connick v. Myers*, 461 U.S. 138, 142 (1983). While the government enjoys greater latitude in regulating the speech of its employees than that of the general public, a citizen does not surrender all First Amendment protection by accepting a job with a governmental entity. *See Carreon v. Ill. Dep't of Human Servs.*, 395 F.3d 796, 790-91 (7th Cir. 2005) (citing *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). The Court must apply a three-part analysis in evaluating Kodrea's First Amendment retaliation claim under 42 U.S.C. § 1983: 1) Was his speech constitutionally protected? 2) If so, were Defendants' actions motivated by Kodrea's constitutionally protected speech? 3) If Kodrea can show that his constitutionally protected speech was a substantial or motivating factor in his termination, can Defendants show that they would have taken the same action in the absence of Kodrea's exercise of his rights under the First Amendment? *See Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 973 (7th Cir. 2000). If Kodrea can establish the first two prongs, the burden shifts to Defendants to prove that Kodrea would have been terminated regardless of his protected speech. *See Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992). If Defendants carry that burden, Kodrea bears the burden of persuasion to show that Defendants' proffered reasons were pretextual and that discrimination was the real reason Defendants fired him. *See King v. Preferred Tech. Group*, 166 F.3d 887, 893 (7th Cir. 1999). In the summary judgment context, this means that Kodrea must show that a rational factfinder could infer that Defendants' stated reasons for firing him were lies. *See Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 683 (7th Cir. 2001).

---

claims against the Mayor in his official capacity.

### 1.  <u>Constitutionally Protected Speech</u>

Whether Kodrea's speech is protected under the First Amendment is normally a question of law for the Court to determine.  *See Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999).  In addressing this question, the Court must determine whether Kodrea spoke as a citizen on a matter of public concern.  *See Connick*, 461 U.S. at 147.  However, to the extent that there are factual issues that must be addressed by a jury first, the Court will be unable to make a conclusive determination.

The main thrust of Defendants' argument is that Kodrea's speech was not done in his capacity as a citizen but in the context of his employment.  The Supreme Court just recently addressed the issue of whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties in *Garcetti, et al. v. Ceballos*, 547 U.S. ---, 2006 WL 1458026 (May 30, 2006).  The plaintiff in *Garcetti*, Ceballos, was a deputy district attorney employed as a calendar deputy with supervisory responsibilities.  *See Garcetti*, 2006 WL 1458026, *3.  Pursuant to his duties, he investigated a complaint from a defense attorney regarding inaccuracies in an affidavit used to obtain a search warrant.  *See id.*  Following his investigation, Ceballos prepared a memo outlining his concerns with the affidavit and recommending that the case be dismissed.  *See id.*  Ceballos' memo prompted a meeting with his supervisors and members of the sheriff's department that allegedly became very heated.  *See id.* at *4.  In spite of Ceballos' concerns,  the district attorney's office decided to proceed with prosecution.  *See id.*  Thereafter, during a hearing on a motion challenging the warrant, Ceballos was called by the defense to testify about his observations, but the trial court upheld the warrant.  *See id.*  Ceballos claimed that he was subsequently subjected to retaliation, including a transfer and

denial of a promotion.  *See id.*

   The Supreme Court found that the controlling factor in answering the question of whether Ceballos' speech was protected was that his expressions were made pursuant to his official duties. *See id.* at *8.  Indeed, part of Ceballos' responsibilities were to investigate concerns and advise  his supervisors regarding pending cases, a fact that was not disputed by the parties.  *See id.*  Under these circumstances, the Supreme Court concluded that Ceballos was not acting as a citizen but as a government employee, doing what he was employed to do, and so his speech did not qualify for First Amendment protection.  *See id.*[3]

   In reaching this decision, the Supreme Court made several observations applicable to this case.  First, because the parties did not dispute that Ceballos' memo was done pursuant to his duties, the Supreme Court observed that it did not have occasion to articulate a framework for defining the scope of an employee's duties in cases where there is room for serious debate.  *See id.* at *10.  It did reject, however, the suggestion that an employer can restrict an employee's rights simply by creating broad job descriptions.  *See id.*  In addition, the Court was not persuaded that Ceballos' speech was unprotected merely because he had expressed his views in the office and they concerned the subject matter of his employment, explicitly noting that in some cases employees may still receive First Amendment protection for expressions made at work or related to the employee's job.  *See id.* at *7.

   *Garcetti* reveals that an important factor in addressing whether or not Kodrea's speech was protected is his job responsibilities.  Unlike the situation in *Garcetti*, however, there is a factual dispute in this case concerning whether Kodrea's complaints about Campbell's hours and the ASA

_____

   [3]  Prior to this ruling, the Seventh Circuit had found no constitutional protection for speech made under similar circumstances.  *See*, *e.g.*, *Schad v. Jones*, 415 F.3d 671 (7th Cir. 2005); *Gonzalez v. City of Chicago*, 239 F.3d 939 (7th Cir. 2001).

14

refund were made pursuant to his ordinary duties.  As Kodrea notes, nothing in his job description required him to monitor or report misconduct.  Dep. Ex. 13; Kodrea Dep. at 29.  Further, Kodrea was not responsible for signing and approving or otherwise completing Campbell's time sheets; that responsibility was handled by Smith and the Parks Department secretaries.  Metz Dep. at 16-18; Reed Dep. at 32, 35, 41; Kodrea Dep. at 144; Kodrea Aff., ¶ 5.  Indeed, it is not clear how much oversight Kodrea even had over Campbell's hours because Smith apparently authorized Campbell to work from home, authorization that should have come from Campbell's supervisor and which Kodrea knew nothing about.  Smith Dep. at 15; Dodd Dep. at 28; Kodrea Aff., ¶ 5.  Finally, Kodrea claim that Smith explicitly told him not to worry about Campbell's hours and that it was not a problem, which suggests that it was Smith's responsibility to oversee Campbell's hours rather than Kodrea's.  Kodrea Dep. at 140, 142-43.

With respect to the ASA and refunds, the evidence and testimony favorable to Kodrea demonstrates that he did not determine the amount of the initial ASA fees; that amount had been the same for years.  Reed Dep. at 17; Kodrea Dep. at 87.  Further, beyond keeping track of the teams and collecting the registration fees for teams, Kodrea was not responsible for handling money.  Kodrea Dep. at 91.  Specifically, he was not responsible for depositing the collected fees in the bank or with the controller or with handling any paperwork related to these activities.  Metz Dep. at 12-13; Reed Dep. at 17, 25; Kodrea Dep. at 88-89.  Finally, there is no evidence that Kodrea had any oversight of the refunds.  To the contrary, he claims that Smith said he would take care of this issue, which suggests that the refund process was not part of Kodrea's job at all.  Kodrea Dep. at 94.

15

Simply put, there are factual issues about whether Kodrea's ordinary job responsibilities included overseeing Campbell's hours of work and the ASA refunds.  Neither activity appears to have been Kodrea's core function as a recreational program director.  The Court is unable to conclude that Kodrea's complaints were made simply as an employee rather than a concerned citizen.  Accordingly, the Court must resolve any doubt in favor of Kodrea for purposes of summary judgment and conclude at this stage of the proceedings that Kodrea may have acted as a concerned citizen.  Therefore, from the record before the Court, Defendants are not entitled to summary judgment on the question of whether Kodrea acted as a concerned citizen and *Garcetti* does not preclude Kodrea from presenting his claims to a jury for consideration.

Having concluded that there is a factual dispute about whether Kodrea acted as a citizen that precludes entry of summary judgment, the Court must next address whether Kodrea's speech was a matter of public concern.  To answer this question, the Court must look at "'the precise content, form, and context of the speech that admittedly may be of some interest to the public.'" *Kokkinis*, 185 F.3d at 844 (quoting *Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 410 (7th Cir. 1994)).  Relevant questions include whether the point of the speech was to raise issues of public concern or to further a purely private interest.  *See id.* (internal citations omitted).  The content of the speech is the most important factor in the inquiry.  *See Kuchenreuther*, 221 F.3d at 974.  Unlike the question of whether not Kodrea acted as a citizen, the Court finds that it is able to make the legal determination of whether Kodrea's speech was on a matter of public concern.

First, the content of the speech in question supports a conclusion that the speech is a matter of public concern.  Kodrea's speech concerned a situation where an employee was allegedly not working the hours for which he was being paid and a situation of potential misappropriation of

funds.  Numerous cases from the Seventh Circuit have discussed complaints regarding potential breaches of public trust in situations of time abuse and misuse of funds and concluded that the speech is on a matter of public concern.  *See, e.g., Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 941 (7th Cir. 2004); *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219-20 (7th Cir. 1994); *Breuer v. Hart*, 909 F.2d 1035, 1038 (7th Cir. 1990); *Ohse v. Hughes*, 816 F.2d 1144, 1150-51 (7th Cir. 1987), *vacated and remanded*, 485 U.S. 802, *reinstated in relevant part*, 863 F.2d 22 (1988).  Indeed, "[s]peech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests." *Gazarkiewicz*, 359 F.3d at 941 (quoting *Conaway v. Smith,* 853 F.2d 789, 797 (10th Cir.1988)).  The Court concludes that the content of Kodrea's speech is comfortably on the socially valuable side of the constitutional line.

The Court next considers the form of Kodrea's speech.  Kodrea initially conveyed his concerns internally to Smith, his supervisor.  Defendants contend that Kodrea's speech was not a matter of public concern because he did not seek a form of communication to air his concerns publically.  However, First Amendment protection of speech is not limited to only those instances where the speech is broadcast to the world.  *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979).  The fact that Kodrea may have spoken privately with Smith does not make his speech less a matter of public concern.  *See Delgado v. Jones*, 282 F.3d 511, 518 (7th Cir. 2002) (citing *Givhan*, 439 U.S. at 415-16).  Indeed, as the Seventh Circuit has recognized, "an employee who attempts to follow internal mechanisms to resolve important issues should not be automatically treated less favorably than the individual who immediately turns to the press or public forum." *Spiegla v. Hull*, 371 F.3d 928, 937-38 (7th Cir. 2004).  To accept Defendants' argument would be

17

to disregard these principles and place a burden on plaintiffs to become public champions of potential wrongdoing in order to be afforded First Amendment protection, a result not required by the law.  Moreover, the Court notes that Kodrea has presented evidence suggesting that he did not simply report his concerns to his supervisors but also consulted other City employees for advice on the matters.  Kodrea Dep. at 126, 129, 139; Liali Aff., ¶¶ 4-5; McKinney Aff., ¶¶ 4-8.  Under the circumstances, the Court is unable to find that the form of Kodrea's speech renders it unworthy of constitutional protection.

Finally, the Court considers the context of Kodrea's speech.  At this stage, the Court considers Kodrea's motive for speaking as a "relevant, though not dispositive, factor."  *Spiegla*, 371 F.3d at 938 (citing *Sullivan v. Ramirez*, 360 F.3d 692, 700 (7th Cir. 2004).  "Motive matters to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected if the expression addresses only the personal effect upon the employee."  *Gustafson v. Jones*, 290 F.3d 895, 908 (7th Cir. 2002) (internal quotations and citations omitted).  In considering the context of speech, "it is necessary to look at the point of the speech in question:  was it the employee's point to bring wrongdoing to light?"  *Kokkinis,* 185 F.3d at 844 (internal quotations omitted).  The fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove it from the scope of public concern.  *Cliff,* 42 F.3d at 410.  To find otherwise would permit motive to supplant content in terms of overall importance.  *Id.*

Here, the Court disagrees with Defendants' contention that the evidence shows that Kodrea's only motivation for speaking was to protect his job.  Kodrea claims that he began expressing concerns related to Campbell's work hours in the fall of 2003 and expressed concerns again in May 2004, both before he received the problem employee performance appraisal form dated June 25,

2004. Kodrea Dep. at 130-31, 135, 138, 140-43; Dep. Ex. 12(E). Kodrea also spoke with Smith about the ASA refunds prior to receiving the problem employee performance appraisal form. Kodrea Dep. at 89-90, 93-96; Kodrea's Answers to Interrogatories at 3; Dep. Ex. 12(E). Kodrea claims that the first time he heard about any problems with his performance was the problem employee performance appraisal. Kodrea Dep. at 118. After receiving the appraisal, Kodrea began to question it as retaliation for raising his concerns with Smith. Kodrea Dep. at 100. While Kodrea's motivation from that point on in part may have been a desire to protect his job, the Court cannot conclude from the timing of Kodrea's speech that Kodrea's sole motivation in voicing his concerns was for personal reasons. Therefore, the Court finds that the context of Kodrea's speech supports a conclusion that Kodrea's speech was on a matter of public concern.

Considering the content, form, and context of Kodrea's speech, with the overriding consideration given to the speech's content as required by precedent, the Court concludes that Kodrea's speech was on a matter of public concern. As a final matter then, the Court must consider the *Connick-Pickering* balance test.[4] Even if speech relates to a matter of public concern, it is not constitutionally protected unless the speaker's First Amendment interests outweigh the public employer's interests in providing services efficiently. The parties have not presented any meaningful argument with regard to the *Connick-Pickering* balance test; however, there is nothing

---

[4] Factors to be considered when balancing an employee's and employer's relative interests include: "(1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public." *Kokkinis*, 185 F.3d at 845 (citation omitted).

in the record to suggest that Kodrea's speech was sufficiently disruptive that the government's interest in promoting efficiency outweighed Kodrea's First Amendment rights.  Indeed, it appears that Kodrea voiced his concerns to his immediate supervisors in a non-disruptive manner through the appropriate chain of command.  Accordingly, and assuming without deciding that Kodrea spoke as a citizen, the Court must conclude at this stage that Kodrea's speech is protected.  Defendants are therefore not entitled to summary judgment on this issue.

### 2.  Substantial or Motivating Factor/Pretext

The Court must next address whether retaliation was the substantial or motivating factor in Defendants' decision to terminate Kodrea.  *See Carreon*, 395 F.3d at 791.  In order to prove retaliation, it is not enough to show that a defendant "welcomed" the end of the protected activity "or even that such activity played some minor role in the [adverse employment] decision." *Rakovich v. Wade*, 850 F.2d 1180, 1189 (7th Cir. 1988) (citations omitted).  *See also O'Connor v. Chi. Transit Auth.*, 985 F.2d 1362, 1369 (7th Cir. 1993).  A plaintiff must demonstrate a causal link between the protected speech and the adverse employment action.  *See Healy v. City of Chicago*, --- F.3d ---, 2006 WL 1652434, *6 (7th Cir. June 16, 2006).  However, a plaintiff also does not have the onerous burden of showing that retaliatory motive was the sole reason for the defendant's actions.  *Rakovich*, 850 F.2d at 1190.  Instead, a plaintiff's burden is to show that "*had it not been for the violation*, the injury of which he complains would not have occurred."  *Id.*  (citations omitted) (emphasis in original).  Additionally, a plaintiff may show improper motivation based on the timing of the adverse employment action, *i.e.*, by showing that the action "took place on the heels of protected activity." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994).

Defendants claim that Kodrea was terminated for a legitimate reason, *i.e.*, poor performance. However, Kodrea has presented sufficient evidence to place that rationale in dispute.  Prior to the problem employee peformance appraisal, Kodrea received numerous compliments on the work that he was doing.  Dep. Ex. 12(B).  Further, his previous performance evaluation had been, for the most part, favorable.  Dep. Exs. 12(D), 15.  Indeed, Kodrea claims that the first time that Defendants made any mention of poor performance was when he received the problem employee performance appraisal, and Smith verified that Kodrea had not received any written communication expressing poor performance prior to that time.  Kodrea Dep. at 70, 118; Smith Dep. at 109.  Kodrea claims that the appraisal surfaced right after he spoke with Smith about the ASA refunds.  Kodrea Dep. at 89-90, 93-96; Kodrea's Answers to Interrogatories at 3; Dep. Ex. 12(E).  Kodrea also claims that when he received the appraisal he was given the ultimatum to resign or be fired, but chose to file a response and questioned the action as retaliation.  Kodrea Dep. at 100; 120-21, 126.

Further, following the problem employee performance appraisal, Kodrea was placed on probation for thirty days.  Kodrea Dep. at 145-46.  Defendants contend that the probation period was extended an additional thirty days; however, like the lack of written communication on alleged poor performance, there is a lack of anything in writing to document such an extension.  Indeed, Kodrea claims that he was informed that he had completed probation and believed that he had completed probation satisfactorily.  Kodrea Dep. at 154, 156; Dep. Ex. 33.

Here, the timing of Defendants' employment actions is suspect.  The first time that Kodrea received a written communication regarding alleged poor performance was shortly after he expressed concerns about the ASA refunds.  Moreover, once Kodrea persisted in voicing his concerns and claimed retaliation, he was ultimately terminated.  Finally, Kodrea testified that he was

awarded unemployment benefits, which if true suggests that the Indiana Department of Workforce Development found no just cause for the termination.   Kodrea Dep. at 171.   Under the circumstances, the Court concludes that a jury could reasonably find that Kodrea's speech was a substantial or motivating factor for the poor performance appraisal and, ultimately, termination and that Defendants' stated reasons for their actions are mere pretext.

### 3. Qualified Immunity and Individual Liability

Defendants contend that even if Kodrea's speech is protected, they are entitled to qualified immunity.  Defendants Smith and the Mayor further claim that they cannot be individually liable for any violation that may have occurred because they did not personally participate in Kodrea's termination.  The Court addresses each argument in turn.

Government officials enjoy qualified immunity and are shielded from civil liability, "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638 (1987). To determine whether an official is entitled to qualified immunity requires a two part inquiry, as follows:  (1) whether the facts alleged, taken in the light most favorable to the party asserting the injury, demonstrate that the official's conduct violated a constitutional right;  and (2) whether the right was "clearly established" such that it would have been clear to a reasonable official "that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001).

The Court has already concluded that the facts as alleged and in the light most favorable to Kodrea reveal that Kodrea's First Amendment right may have been violated.  Therefore, if Kodrea's right was "clearly established," then Defendants do not have qualified immunity.

The Court concludes that the right was clearly established.  As the Court has already noted, numerous cases demonstrate that complaints by public employees regarding time abuse or the misuse of funds are matters of public concern.  Further, *Connick* has been the law for over twenty years.  In addition, former Mayor Trobaugh was certainly aware of an employee's First Amendment rights to speak out on such matters  Troubaugh Aff., ¶¶ 8-9.  Dodd was likewise aware that an employee could not be retaliated against for voicing his concerns.  Dodd Dep. at 65.  Finally, Defendants were apparently aware that Kodrea's complaints touched on a matter of public concern as they purport to have investigated the allegations.  Under the circumstances, any reasonable individual in Defendants' positions would have recognized that Kodrea could not be terminated for expressing concerns about Campbell's work hours or the ASA refunds.  Defendants are therefore not entitled to qualified immunity.

The Court must next consider the question of individual liability for the Mayor and Smith. To establish liability under § 1983, it is necessary to show some causal connection between the action complained of and the official sued.  *See Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983).  However, direct participation by a defendant is not necessary.  *See Conner v. Reinhard*, 847 F.2d 384, 396 (7th Cir. 1988).  Instead, any official who "causes" a citizen to be deprived of her constitutional rights can be held liable.  *Id.* at 396-97.  "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of [his] constitutional rights."  *Id.* at 397.

Here, the Court concludes that a jury could reasonably find that both the Mayor and Smith participated in the adverse employment actions against Kodrea.  With respect to the Mayor, Dodd testified that the Mayor is ultimately responsible for decisions on employment issues.  Dodd Dep.

23

at 12, 15. The Mayor likewise testified that in most cases he is part of the termination process. McKillip Dep. at 54. Further, the Mayor was kept apprised of the employment issue with Kodrea and tacitly approved of Dodd's decision to terminate Kodrea when Dodd notified the Mayor of that decision. Dodd Dep. at 42-43. It also appears that the Mayor was the individual responsible for recommending the use of the problem employee performance appraisal form (the first instance, according to Kodrea, of anyone noting a problem with his performance), and the Mayor approved all employment policies that were drafted by Human Resources. McKillip Dep. at 43; Kodrea Dep. at 118; Dodd Dep. at 19. Finally, the Mayor was involved in Kodrea's grievance process, ultimately denying the grievance and upholding the decision to terminate. McKillip Dep. at 59. Based on these circumstances, the Court finds that a jury reasonably could conclude that the Mayor helped to set in motion the events that led to the alleged retaliation.

Likewise, the Court finds that a jury reasonably could conclude that Smith is individually liable. Smith recommended Kodrea's termination, a  recommendation upon which the jury could reasonably infer that Dodd relied. Smith Dep. at 49. Smith also completed the problem employee performance appraisal, and he apparently worked with Dodd on drafting that form. Smith Dep. at 73; Dep. Exs. 12(E), 24. Further, Smith was involved with discussions with the Mayor and Dodd about Kodrea's employment, and he was in charge of the counseling sessions with Kodrea that followed the problem employee performance appraisal. Dodd Dep. at 41, 53-54; Kodrea Dep. at 153. Finally, Kodrea claims that one of the volunteers for softball told him that Smith was going to fire him, and Kodrea claims that when Smith provided him with a copy of the problem employee performance appraisal Smith gave Kodrea the ultimatum to resign or be fired. Kodrea Dep. at 120-21, 244. Taking the circumstances in the light most favorable to Kodrea, the Court finds that Smith,

like the Mayor, could be found to have participated in the adverse employment actions. Accordingly, the Court denies summary judgment on the question of individual liability for both the Mayor and Smith.

### 4. Municipal Liability

As a final matter, the Court must address the question of municipal liability. A government entity is only liable under § 1983 when execution of a government policy or custom "by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" inflicts the injury of which a plaintiff complains. *See Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Unconstitutional policies or customs can take three forms: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that, although unauthorized, is so permanent and well-settled that it constitutes a "custom or usage" with the force of law; or (3) an allegation that a person with final policymaking authority caused the injury. *See Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003). Defendants contend that summary judgment is appropriate because there is no evidence of any policy or custom. The Court, however, disagrees and finds that summary judgment is inappropriate.

A single constitutional violation by a person with final policymaking authority may trigger liability under § 1983. *See Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 737 (7th Cir. 1999). Here, the Mayor had the ultimate responsibility for decisions related to employment issues, and he testified that in most cases he is part of the termination process. Dodd Dep. at 12, 15; McKillip Dep. at 54. In fact, the evidence favorable to Kodrea reveals that the Mayor participated in and approved of the decision to terminate Kodrea. Dodd Dep. at 43; McKillip Dep. at 43, 59.

Defendants nonetheless contend that there can be no municipal liability because Dodd fired Kodrea.  Even if the Mayor played no part in Kodrea's termination, and in spite of the evidence to the contrary suggesting the Mayor's involvement, Defendants cannot escape municipal liability by claiming that Dodd made the termination decision on his own.  Final policymaking authority may be delegated or ratified by an official having policymaking authority.  *See Kujawski*, 183 F.3d at 737;  *Waters v. City of Chicago*, 416 F. Supp.2d 628, 630 (N.D. Ill. 2006).  In this case, there is evidence that when Dodd made the decision to terminate Kodrea the Mayor approved of the decision.  Dodd Dep. at 12-13, 42-43; Smith Dep. at 49; McKillip Dep. at 59.  As Dodd acknowledged, the Mayor had the ultimate responsibility for decisions related to employment issues, including approval of employment policies (Dodd Dep. at 12, 15, 19), and his approval of Dodd's decision means that municipal liability can be imposed.

Moreover, municipal liability could be imposed even if the Mayor and Dodd deny any motive for retaliation against Kodrea.  A jury could reasonably infer that the decision to terminate Kodrea was based on Smith's recommendation, and a jury could certainly conclude that Smith had a reason for retaliating against Kodrea.  As the Northern District of Illinois recently noted, "a tainted input" may be sufficient to establish liability.  *Waters*, 416 F. Supp.2d at 630-31.  *See also Dey*, 28 F.3d at 1459.

For all of these reasons, the Court concludes that Defendants are not entitled to summary judgment on the question of municipal liability.

26

## B.  STATE WHISTLEBLOWER CLAIM

While Defendants offer several rationales for why they are entitled to summary judgment on Kodrea's state whistleblower claim, the Court finds one dispositive: whether Kodrea has a private right of action under Indiana Code § 36-1-8-8.  This statute provides in relevant part that a public employer may not terminate an employee for reporting in writing a violation of law or misuse of public resources.  An employer who violates this statute commits a Class A infraction.  *See* Ind. Code § 36-1-8-8(d).  Whether or not Defendants may have violated the state statute, the Court concludes that the state statute does not provide Kodrea with a private right of action.

The parties have not directed the Court to any Indiana appellate decisions addressing this particular statute, and the Court's own research found none.  Therefore, the Court must look to the language of the statute itself to determine whether the General Assembly intended to provide for a private right of action.  The Court concludes that the plain language of the statute clearly limits Kodrea's remedy to appealing any disciplinary action pursuant to the procedures set forth by personnel policy or collective bargaining agreement, a remedy which Kodrea apparently employed via the grievance process in which the termination decision was upheld.  *See* Ind. Code § 36-1-8-8(c).  Thus, on its face, the statute does not grant Kodrea a private right of action.

This conclusion is strengthened by a comparison of this statute with Indiana Code § 22-5-3-3, a "companion" statute passed in the same piece of legislation.  *See* 1987 Ind. Acts, Pub. L. No. 32, §§ 3-4 at 938-40.[5]  Indiana Code § 22-5-3-3 provides protection for employees of private employers under public contract and is virtually identical to § 36-1-8-8 in all material respects

_____

[5] The two statutes were also later amended at the same time.  *See* 1990 Ind. Acts, Pub. L. No. 9, §§ 14, 16 at 482-85.

except for the remedy in subsection (c).  Specifically, § 22-5-3-3(c) provides that an employee of a private employer under public contract may "process an appeal of [any] disciplinary action as a civil action."  This difference in language reveals that the General Assembly can and does provide for a civil remedy when it chooses to do so.[6]  Further, unlike § 36-1-8-8, § 22-5-3-3 has been addressed by  Indiana's appellate courts.  The Indiana Court of Appeals agreed that where an employee of a private employer under public contract brings a whistleblower claim, the cause of action arises under § 22-5-3-3 rather than common law.  *See Coutee v. Lafayette Neighborhood Hous. Servs., Inc.*, 792 N.E.2d 907, 911-12 (Ind. Ct. App. 2003), *reh'g and trans. denied.*  Based on *Coutee*, this Court concludes that in order for Kodrea to have a cause of action, it must arise under Indiana Code § 36-1-8-8 itself.  Again, however, the statute explicitly limits Kodrea's remedy and does not provide for a private right of action.

Finally, the Court notes that its conclusion that Kodrea does not have a private right of action is consistent with Indiana's employment-at-will doctrine, which provides that where there is no definite term of employment that the employment is at-will and is presumptively terminable at any time, with or without cause.  *See Coutee*, 792 N.E.2d at 911.  One exception to this doctrine is the public policy exception, which is applicable when an employee is discharged for exercising a statutory or constitutional right or for refusing to commit an illegal act for which he would be personally liable.  *See*, *e.g.*, *McGarrity v. Berlin Metals, Inc.*, 774 N.E.2d 71, 76 (Ind. Ct. App. 2002);  *Pepsi-Cola Gen. Bottlers, Inc. v. Woods*, 440 N.E.2d 696, 697 (Ind.Ct. App. 1982).  However, the Indiana Supreme Court has been reluctant to broaden the exceptions to the

---

[6]  In fact, the General Assembly recently provided for such a remedy in legislation protecting employees who report that false claims for payment have been made to the State.  *See* 2005 Ind. Acts, Pub. L. No. 222, § 23 at 3591 (codified as Indiana Code § 5-11-5.5-8(c)).

employment-at-will doctrine in the absence of clear statutory expression, and so the public policy exception has been construed narrowly by Indiana courts. *See*, *e.g.*, *Dale v. J.G. Bowers, Inc.*, 709 N.E.2d 366, 368 (Ind. Ct. App. 1999); *Wicor v. Anchor Indus., Inc.*, 669 N.E.2d 172, 177 n. 5 (Ind. 1996). Thus, where the General Assembly has explicitly provided a remedy for a violation in a statute itself, courts have found the public policy exception inapplicable. *See Groce v. Eli Lilly & Co.*, 193 F.2d 496, 502-04 (7th Cir. 1999) (discussing Indiana state law claim of retaliatory discharge for reporting violations of the Indiana Occupational Safety and Health Act); *Coutee*, 792 N.E.2d at 911. In this case, the statute in question provides a specific remedy, *i.e.*, the right to appeal a disciplinary action pursuant to internal personnel policies, and so under Indiana law the public policy exception would not assist Kodrea. He is therefore limited to the remedy provided in the statute.[7] Given the plain language of the statute and its explicit limitation on a remedy, a comparison of the statute to similar statutory provisions, and the employment-at-will doctrine, Kodrea's argument that a private right of action may be implied is unavailing. Accordingly, the Court concludes that Indiana Code § 36-1-8-8 does not provide Kodrea with a private of right of action. Kodrea's state law claim must therefore be dismissed.

---

[7] The Court notes that Judge Lozano of the Northern District of Indiana, relying on an analysis of the employment-at-will doctrine, recently reached a similar conclusion when he dismissed a plaintiff's state law claim brought pursuant to Indiana Code § 36-1-8-8. *See Jennings v. Warren County Comm'rs*, No. 4:04-cv-094, 2006 WL 694742, *7-8 (N.D. Ind. March 14, 2006).

## V.  CONCLUSION

For the foregoing reasons, Defendants', City of Kokomo, Matthew McKillip, Dan Smith, and Jack Dodd, Motion for Summary Judgment is **GRANTED in part and DENIED in part**. Plaintiff's, Matthew G. Kodrea, state law claim is dismissed with prejudice.

The Court also dismisses the claims against Defendant Matthew McKillip in his official capacity as Mayor.  Any individual claims against Defendant Matthew McKillip remain pending.[8]

IT IS SO ORDERED this 22nd day of June, 2006.

LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

Mary Jane Lapointe
MCMAINS LAPOINTE
lapointe@mcmainslapointe.com

Lawren K. Mills
MCMAINS MORSE P.C.
mills@mcmainsmorse.com

Andrew P. Wirick
HUME SMITH GEDDES GREEN & SIMMONS
awirick@humesmith.com

---

[8] For the reasons stated herein, the Court also **DENIES** Defendants' Motion to Strike (Doc # 77).